UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK DELAMORA, | No. 2:17-cv-0871-MCE-EFB P |
| Petitioner, | |
| v. | <u>FINDINGS AND RECOMMENDATIONS</u> |
| BAUGHMAN, | |
| Respondent. | |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He raises three grounds for relief in his petition, namely that: (1) his attempted murder conviction and firearm enhancement were not supported by sufficient evidence; (2) the prosecution failed to test gunshot residue samples for all suspects; and (3) his trial counsel rendered ineffective assistance. Respondent filed an answer to these claims (ECF No. 16) and petitioner has not filed a traverse within the allotted time.

/////
/////
/////
/////
/////
/////

# BACKGROUND

I. Proceedings In the Trial Court[1]

   A. Prosecution Case

      1. Shooting at the Sunnyslope Apartments

On April 11, 2011 at approximately one a.m., Andre Pointer, Mike Lee, Jami Buntun, and Jesus Meses were returning to the Sunnyslope Apartments after buying beer from a nearby store. As the four entered the apartment complex through the pedestrian gate, a man called out to them and demanded "Ant, where's my money?" Meses replied that he did not know anyone named "Ant" and that he had no idea what the speaker was talking about.

Simultaneously, a security guard at the complex – Cecilio Bustillos – sat in his vehicle and watched the man approach. Bustillos would subsequently identify this individual as the petitioner. Bustillos recognized petitioner as someone who had often visited the apartment complex in the past. Before Bustillos could step out of his vehicle, petitioner opened fire at Pointer, Lee, Buntun, and Meses with an AK-47.

Petitioner fired between twenty and thirty rounds, many of which ricocheted off cars in the parking lot. After petitioner stopped firing, he got into the passenger seat of a Ford Mustang that was waiting in the parking lot. As the Mustang drove away, Bustillo was able to get a clear glimpse of the driver and would later identify this individual as Jesus Montano, petitioner's co-defendant.

Lee and Bunton suffered bullet wounds to their thighs. One parked car was struck by eleven bullets. One bullet entered an apartment living room wall and came to rest on the kitchen stove.

After initially withholding information from detectives, Meses ultimately admitted that he was not being truthful when he told petitioner that he did not know anyone named Ant. He informed them that Ant occasionally sold drugs at the apartments and had claimed to be a member of the Norteno gang.

---

[1] This summary is based on the court's independent review of the trial record.

## 2. California Highway Patrol Shooting and Chase

California Highway Patrol ("CHP") Officer David Costa was traveling with a civilian ride-along named Kevin Tasler when they saw the Mustang slide through a turn. Officer Costa gave chase as the Mustang accelerated to more than eighty-miles per hour. Subsequently, the Mustang briefly slowed to a stop, allowing Officer Costa to report the plate number to dispatch.

The Mustang then pulled into a cul-de-sac. Officer Costa entered the cul-de-sac just as the Mustang was exiting. The Mustang's passenger elevated himself out of the window, levelled an AK-47, and fired two shots. Officer Costa quickly placed his car in reverse and left the cul-de-sac.

The pursuit continued toward Highway 99. As Officer Costa pursued the Mustang onto the highway ramp, the gunman leaned out of the window, faced back, and fired more than twenty rounds. During the course of the freeway chase, bullets fired from the gunman in the Mustang struck a minivan being driven by Elizabeth West, who was travelling with her three children. One bullet pierced the van's windshield and struck a portable DVD player. Fragments from this destruction struck West's daughter and lacerated her leg.

Officer Costa continued pursuing the Mustang, until he lost sight of it at the 47th Avenue freeway exit. Pamela Dow lived in an apartment with a view of the 47th Avenue off ramp. She told officers that, on the night of the chase, she heard a loud noise and saw a gray car parked on the grass near the exit. The passenger left the car, jumped the apartment complex fence, and ran through an open courtyard. The driver called out to him, "Chino, get back here." The passenger declined, responded "I'm good," and kept running.

## 3. Montano's Interview

Early on the morning of April 11, 2010, Detective Brandon Luke of the Sacramento County Sheriff's Department traveled to a motel on Massie Court to assist with the ongoing investigation. Police had earlier responded to a noise complaint and found the Mustang used in the Sunnyslope shooting. Montano – the Mustang's driver – and Pedro Pantoja – who at that time acknowledged his membership in the Triangle Park Sureno gang – were both in custody when Detective Luke arrived.

Detective Luke and his partner interviewed Pantoja first. Officer Costa had already been asked to view Pantoja and asserted his belief that Pantoja was the shooter. Pantoja admitted his gang membership[2] but adamantly denied having any involvement in the shooting.

The detectives then interviewed Montano. Over the course of two separate interviews, Montano eventually told the detectives that he had problems with Norteno gang members in South Sacramento. Montano denied, however, that Pantoja had been in his car. He also denied knowing anything about shots being fired from his car. Montano did admit, however, driving to an apartment complex, hearing yelling and gunshots, and fleeing CHP pursuit. He stated that he was at the apartment complex to "pick up some weed." He surmised that the shooting broke out because of the presence of some Nortenos who had recognized Montano's opposite gang affiliation because of music he was playing in his car.

The AK-47 had been recovered from the Mustang. Montano told detectives that he had brought the gun from Colorado, where he had been doing oil field work. When detectives asked Montano why he would allow someone else to handle the gun, he stated that he had done so because he was driving the car and, thus, his passenger defaulted to being the "trigger man."

### 4. Conversation Between Montano and Pantoja

After interviewing Montano and Pantoja separately, detectives placed the two in a room together and recorded their conversation. Montano asked Pantoja what he was being charged with and Pantoja replied that "They were saying that I shot, I shot – I didn't even know what in the world was happening, man." Montano stated that "They say that according to you, you said you were with me. That you arrived with me in my car." Pantoja subsequently re-affirmed his lack of involvement, stating "The fuck with that man. I mean, the fucking truth, I wasn't with you . . . ." Pantoja then told Montano that there were plenty of witnesses that he was not in the car with Montano at the relevant times.

/////

/////

---

[2] Pantoja would later say that he was not actually a gang member; he merely hung out with gang members.

4

### 5. Identification of Petitioner

On April 16, 2010, after subsequent investigation that included review of video footage from a business near the 47th Avenue exit ramp, officers served a warrant at petitioner's residence. He was not there at that time, but officers recovered a photograph from petitioner's room which showed him in a Sacramento Kings jersey similar to the one worn by the gunman. Officers also recovered a CD with Sureno gang writing on its face.

On April 28, 2016, petitioner was placed in a live lineup at the Sacramento County Jail. Cecilio Bustillos identified him as the apartment complex shooter.

### 6. Pantoja's Preliminary Hearing Testimony

At the time of the preliminary hearing on June 29 and July 6, 2011, Pantoja had been in custody for over a year on charges of carrying a concealed weapon and committing a crime for the benefit of or in association with a criminal street gang. Subject to a plea agreement, Pantoja agreed to testify truthfully against Delamora and Montano.

Pantoja testified that, on the night of the shooting, he had been inside the motel when Montano and Delamora first arrived. He subsequently joined them outside and saw the AK-47 in the trunk of the Mustang.

After both were arrested, Montano told Pantoja what occurred the night of the shooting. Pantoja related that Delamora, Montano, and a man named Efren Gonzalez had gone to the apartment complex to buy marijuana. Gonzalez had gone into the apartment where the sale was to take place, while Delamora and Montano waited in the parking lot. As Andre Pointer, Mike Lee, Jami Buntun, and Jesus Meses approached they made a substantial amount of noise. Delamora saw them, retrieved the AK-47 from the car, and started firing. Montano told Pantoja that he had not expected this to happen. Delamora and Montano then left the scene at high speed. They were chased by CHP and, after Montano lost control of the Mustang, Delamora fled.

Montano returned to the motel appearing nervous and tense, and refused to answer questions about Delamora's whereabouts. Officers arrived that night and arrested Pantoja for possessing a firearm (different from the AK-47 used in the shooting). Pantoja did not see Delamora again that night.

5

B. Defense Case

Delamora relied on the testimony of Barbara Crouch, who lived at a second-floor Sunnyslope apartment. Crouch had been about to open the sliding glass door to her balcony when she heard gunfire. After the gunfire stopped, she went out on the balcony to take stock of the scene. Crouch saw Bustillos, the security guard, crouched in his car. Contrary to descriptions of the gunman from Bustillos, Crouch testified that she saw a person wearing a dark colored hooded sweatshirt with a large rifle in his hands. She stated that the gunman was Hispanic with long hair and either a bandanna or a do-rag.

C. Outcome

On February 24, 2014, a jury found Delamora (along with Montano) guilty of four counts of attempted murder of a civilian, one count of attempted murder of a peace officer, one count of assault with a semiautomatic firearm on a peace officer, one count of discharging a firearm at an occupied motor vehicle, and one count of discharging a firearm at an inhabited dwelling house. The jury did not reach a verdict as to four other counts of attempted murder, and the trial court declared a mistrial on those counts.

II. Post-Conviction Proceedings

On direct appeal, the court of appeal struck petitioner's California Penal Code section 186.22(b) gang enhancement for not being supported by sufficient evidence. The court of appeal also reversed the trial court's order directing petitioner to pay attorney's fees.

After the court of appeal's decision, the trial court resentenced petitioner to a determinate term of 122 years and four months plus an indeterminate term of fourteen years to life in state prison.

Petitioner then filed two state habeas petitions, one with the Sacramento County Superior Court and one with the California Court of Appeal. Lodg. Docs. 18-21. Both were denied. *Id.* Petitioner never filed a petition with the California Supreme Court, however.

/////

/////

/////

# STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

I. <u>Applicable Statutory Provisions</u>

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000). It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief." *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003). If either prong (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state law procedural principles to the contrary. *Id.* at 784-785 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

/////

/////

A. "Clearly Established Federal Law"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

B. "Contrary To" Or "Unreasonable Application Of" Clearly Established Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact. *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003). The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief. *Williams*, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." *Id.* at 405. This includes use of the wrong legal rule or analytical framework. "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of the AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002). *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[3] because it added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (California Supreme Court's *Batson*[4] analysis "contrary to" federal law because it set a higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

[4] *Batson v. Kentucky*, 476 U.S. 79 (1986).

8

F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[5] violation was contrary to U.S. Supreme Court holding that such error is structural). A state court also acts contrary to clearly established federal law when it reaches a different result from a Supreme Court case despite materially indistinguishable facts. *Williams*, 529 U.S. at 406, 412 13; *Ramdass v. Angelone*, 530 U.S. 156, 165 66 (2000) (plurality op'n).

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407 08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003). This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause). State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to give appropriate consideration and weight to the full body of available evidence, and when they proceed on the basis of factual error. *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v. McCollum*, 558 U.S. 30, 42 (2009).

The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced. *Lockyer*, 538 U.S. at 76. AEDPA does not require a nearly identical fact pattern before a legal rule must be applied. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Even a general standard may be applied in an unreasonable manner. *Id.* In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim. *Id.* at 948.

Review under § 2254(d) is limited to the record that was before the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). The question at this stage is whether the state court

---

[5] *Faretta v. California*, 422 U.S. 806 (1975).

9

reasonably applied clearly established federal law to the facts before it. *Id.* In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." *Id.* at 1399.

Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." *Frantz*, 533 F.3d at 738 (emphasis in original). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In *Richter*, *supra*, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. *Richter*, 131 S. Ct. at 786.

### C. "Unreasonable Determination Of The Facts"

Relief is also available under AEDPA where the state court predicated its adjudication of a claim on an unreasonable factual determination. Section 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court.

Even factual determinations that are generally accorded heightened deference, such as credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2). For example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief where the Texas court had based its denial of a *Batson* claim on a factual finding that the prosecutor's asserted race neutral reasons for striking African American jurors were true. *Miller El*, 545 U.S. at 240.

An unreasonable determination of facts exists where, among other circumstances, the state court made its findings according to a flawed process – for example, under an incorrect legal standard, or where necessary findings were not made at all, or where the state court failed to consider and weigh relevant evidence that was properly presented to it. *See Taylor v. Maddox*, 366 F.3d 992, 999 1001 (9th Cir.), *cert. denied*, 543 U.S. 1038 (2004). Moreover, if "a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in a 'unreasonable determination' of the facts" within the meaning of § 2254(d)(2). *Id.* at 1001; accord *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section

2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings consequently "were made without . . . a hearing"), *cert. denied*, 543 U.S. 1038 (2004); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper determination" of facts because state courts "refused Killian an evidentiary hearing on the matter"), *cert. denied*, 537 U.S. 1179 (2003).

A state court factual conclusion can also be substantively unreasonable where it is not fairly supported by the evidence presented in the state proceeding. *See, e.g., Wiggins*, 539 U.S. at 528 (state court's "clear factual error" regarding contents of social service records constitutes unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state court's finding that the prosecutor's strike was not racially motivated was unreasonable in light of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002) (state court unreasonably found that evidence of police entrapment was insufficient to require an entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

II. The Relationship Of § 2254(d) To Final Merits Adjudication

To prevail in federal habeas proceedings, a petitioner must establish the applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional invalidity of his custody under pre AEDPA standards. *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc). There is no single prescribed order in which these two inquiries must be conducted. *Id.* at 736 37. The AEDPA does not require the federal habeas court to adopt any one methodology. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap. Accordingly, "[a] holding on habeas review that a state court error meets the § 2254(d) standard will often simultaneously constitute a holding that the [substantive standard for habeas relief] is satisfied as well, so no second inquiry will be necessary." *Frantz*, 533 F.3d at 736. In such cases, relief may be granted without further proceedings. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062, 1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321 F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure

to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1) unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at capital sentencing, and granting penalty phase relief).

In other cases, a petitioner's entitlement to relief will turn on legal or factual questions beyond the scope of the § 2254(d) analysis. In such cases, the substantive claim(s) must be separately evaluated under a de novo standard. *Frantz*, 533 F.3d at 737. If the facts are in dispute or the existence of constitutional error depends on facts outside the existing record, an evidentiary hearing may be necessary. *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary hearing after finding § 2254(d) satisfied).

## DISCUSSION

### I. Petitioner's Claims

As a preliminary matter, respondent argues that none of petitioner's claims are exhausted. The court agrees. Exhaustion required petitioner to present his claims to the state's highest court, in this case the California Supreme Court. *See Middleton v. Cupp*, 768 F.2d 1083, 1086 (9th Cir. 1985) (stating that exhaustion requires fair presentation the state's highest court) *cert. denied*, 478 U.S. 1021 (1986). The record indicates that he failed to do so. Nevertheless, the court disposes of petitioner's claims by rejecting them on the merits. *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (noting that federal courts "are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar").

#### A. Sufficiency of the Evidence

Petitioner argues that the court of appeals' decision to overturn his gang enhancement for lack of sufficient evidence establishes that his attempted murder convictions and gun enhancements are similarly flawed.

##### 1. Last Reasoned Decision

The Sacramento County Superior Court rejected this claim in a reasoned decision:

/////

> Petitioner misunderstands the relationship between the substantive offense of attempt murder and an allegation that the attempt murder was committed for the benefit of a street gang. The attempt murder charge was based on Petitioner's act of firing the AK-47 assault rifle from a moving vehicle, at several people, with the specific intent to kill them. (Pen. Code §187 (a).) For a finding of guilt on a charge of attempt murder, it is not necessary to show *why* Petitioner intended to kill them or whether it was for the benefit of a street gang.
>
> In contrast, the gang enhancements add various sentencing enhancements for gang-related felonies. Specifically, section 186.22 (b)(1) requires only two elements: (1) that the defendant committed a felony for the benefit of, at the direction of, or in association with any criminal street gang and (2) that he did so with the intent to promote, further, or assist in criminal conduct by gang members. (*People v. Mejia* (2012) 211 Cal. App. 4th 586, 613, citing *People v. Albillar* (2010) 51 Cal. 4th 47, 67.) In essence, it requires the fact-finder to have found all the elements of the attempt murder, plus additional facts. Thus, the reversal of the street gang enhancements (the additional facts) does not affect the attempt murder convictions.
>
> Further support for this conclusion is seen in the jury instructions themselves. The jury was instructed in this case that the members must first decide Petitioner's guilt on the main charges (i.e., attempt murder). Only upon a finding of guilty, must the jury then decide whether the gang enhancement allegation was true. Thus, the jury was instructed that the main charges of attempt murder were independent of the gang allegations. Again, reversal of the gang allegations leaves intact the attempt murder convictions.

Lodg. Doc. No.19. This claim was raised in a subsequent habeas petition to the California Court of Appeal (Lodg. Doc. No. 20) and it was summarily denied (Lodg. Doc. No. 21).

### 2. Clearly Established Federal Law

Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt. *United States v. Winship*, 397 U.S. 358, 364 (1970). In reviewing the sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1974). If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution." *Id.* at 326. A jury's credibility determination is not subject to review during post-conviction proceedings. *Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("under Jackson, the

assessment of the credibility of witnesses is generally beyond the scope of review."). The federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16.

### 3. Objective Reasonableness Under § 2254(d)

The superior court's rejection of this claim was reasonable. The question of whether sufficient evidence underlies his attempted murder charges and gun enhancements is separate from the question of whether he undertook the offending activity for the benefit of a street gang. As the superior court noted, the relevant jury instructions regarding the main charges – namely attempted murder – were separate from the jury instructions regarding the gang enhancement. *See* Lodg. Doc. No. 1 (Clerk's Transcripts Vol. V) at 1250, 1255. Indeed, the jury instructions specifically stated:

> If you find a defendant guilty of the crimes charged in Counts 1-13, or the lesser offense of Penal Code section 246.3 in Counts 12 and 13, you must then decide whether, for each crime, the People have proved the *additional allegation* that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.

*Id.* at 1255 (emphasis added). Thus, it was not in any way necessary for the jury to find the latter in order to reach a guilty verdict on the former.

The language of the gang enhancement is also instructive on this point. The gang enhancement provision has two elements, namely: (1) that the defendant committed a felony for the benefit of, at the direction of, or in association with any criminal street gang and (2) that he did so with the intent to promote, further, or assist in criminal conduct by gang members. Cal. Penal Code § 186.22(b)(1). From a structural perspective, the gang enhancement "sits on top" of the main offense. In other words, the finder of fact is first required to determine whether a defendant actually committed the underlying felony, whatever it might be. If that finding is affirmative, the jury then turns to the supplementary question of whether the defendant's commission of the underlying felony meets the two foregoing elements for a gang enhancement.

/////

14

And while this supplementary question invariably relates back to the underlying felony, it is an entirely separate determination.

Thus, the decision overturning the gang enhancement for lack of sufficient evidence in no way established that petitioner's attempted murder convictions and gun enhancements violated his due process rights for lack of sufficient evidence and this claim must be denied.

### B. Prosecution's Failure to Test Gunshot Residue Samples

Petitioner argues that the prosecution should have tested all suspects for gunshot residue. He argues that, had it done so, he would have tested negative and Pedro Pantoja would have tested positive.

#### 1. Last Reasoned Decision

The Sacramento County Superior Court rejected this claim in a reasoned decision:

> Petitioner's claim that a gunshot residue test would have excluded Petitioner as a subject[6] is also unavailing. Petitioner claims that if all the suspects had been tested for gunshot residue, Pantoja would have tested positive and Petitioner would have tested negative – indicating that Pantoja was the shooter. However, Petitioner presents no evidence in support of this assertion. Nor does Petitioner present any support for his assertion that the lack of gunshot residue on his own hands necessarily means he did not fire the assault rifle in the attack. Because Petitioner was not immediately arrested, it is conceivable that any gunshot residue was washed off or otherwise removed during that time.
>
> Moreover, the evidence supports the conclusion that Petitioner was the shooter. Petitioner was seen near the assault rifle three days prior to the shooting and again on the night of the shooting. Petitioner was also in the area where the shooting began and his fingerprint was found inside the car involved. Critically Petitioner was identified as the shooter. The state can rely entirely on circumstantial evidence to connect a defendant to the commission of a crime. (*People v. Allen* (11985) 165 Cal. App. 3d 616, 625.) Here, there was sufficient evidence, both circumstantial and direct, to convict Petitioner. Even if Petitioner's claim that he had no gunshot residue is true, such evidence would not likely have affected the outcome of the trial in light of the strong circumstantial and direct evidence of his guilt.

Lodg. Doc. No. 19. This claim was raised in a subsequent habeas petition to the California Court of Appeal (Lodg. Doc. No. 20) and it was summarily denied (Lodg. Doc. No. 21).

---

[6] This court assumes that the superior court meant "suspect."

15

### 2. Clearly Established Federal Law

The Supreme Court has held that law enforcement does not have a constitutional obligation to perform any particular forensic tests. In *Arizona v. Youngblood*, the Supreme Court wrote:

> The Arizona Court of Appeals also referred somewhat obliquely to the State's 'inability to quantitatively test' certain semen samples with the newer P-30 test. . . . If the court meant by this statement that the Due Process Clause is violated when the police fail to use a particular investigatory tool, we strongly disagree. The situation here is no different than a prosecution for drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests.

488 U.S. 51, 58-59 (1988).

Law enforcement does, however, have an obligation under the Fourteenth Amendment's Due Process Clause to preserve evidence that "might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984). To meet this standard, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. When law enforcement destroys evidence that might have exonerated a defendant, he must also show bad faith on the part of law enforcement in failing to preserve the evidence. *Youngblood*, 488 U.S. at 57.

### 3. Objective Reasonableness Under § 2254(d)

The superior court's denial of this claim was reasonable. As noted above, the Supreme Court has never held that law enforcement has a constitutional obligation to perform any specific forensic tests. And, as the superior court noted, it is undisputed that petitioner was not arrested immediately after the shooting occurred. Given that any gunshot residue could have been removed during the time between the shooting and his arrest, a negative residue test of petitioner's person would not have definitively exonerated him.

Nor has petitioner shown that a gunshot residue test of Pedro Pantoja would: (1) definitely have produced evidence indicating that Pantoja was the shooter; or (2) that law enforcement acted

in bad faith by declining to test Pantoja. In *Illinois v. Fisher*, the Supreme Court held that, where law enforcement fails to preserve evidence that is merely "potentially useful" to a criminal defendant, a due process violation occurs only where the defendant can demonstrate that law enforcement acted in bad faith. 540 U.S. 544, 547-548 (2004). Here, a residue test of Pantoja was only potentially useful – that is, petitioner cannot demonstrate that the results of such a test would have been definitively material exculpatory evidence. Thus, he must show that law enforcement acted in bad faith by failing to collect such evidence. He has failed to do so. To be sure, petitioner makes conclusory allegations of an "under-handed deal" between Pantoja and the prosecution, but he has failed to offer any corroborating evidence of such an agreement. Finally, petitioner's argument that the evidence against Pantoja was "overwhelming" is belied by the record. To the contrary, the evidence against petitioner was strong – he was identified by a witness as the shooter from a live lineup (4 RT at 1126), his fingerprint was found inside the Mustang (5 RT at 1355), and witness testimony placed him in the area of the shooting on the night in question (2 RT at 438-39, 3 RT at 840).

### C. Ineffective Assistance of Counsel

Petitioner contends that his trial counsel rendered ineffective assistance by failing to: (1) object to the gang enhancement; and (2) compel discovery of gunshot residue tests with respect to all suspects and especially Pedro Pantoja.

#### 1. Last Reasoned Decision

The Sacramento County Superior Court rejected this claim in a reasoned decision:

> Finally, Petitioner claims that counsel was ineffective for failing to object to the above errors. To show constitutionally inadequate assistance of counsel, a defendant must show that counsel's representation fell below an objective standard and that counsel's failure was prejudicial to the defendant. (*In re Alvernaz* (1992) 2. Cal. 4th 924, 937.) Actual prejudice must be shown, meaning that there is a reasonable probability that, but for the attorney's error(s), the result would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) It is not a court's duty to second-guess trial counsel and great deference is given to trial counsel's tactical decisions. (In re Avena (1996) 12 Cal. 4th 694, 722.) Petitioner cannot make the requisite showing. As discussed, the claimed errors have no merit and Petitioner has not shown that he was actually prejudiced by them.

Lodg. Doc. 19.

## 2. Clearly Established Federal Law

The clearly established federal law governing ineffective assistance of counsel claims is that set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a Strickland claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id*. at 687-88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 562 at 104 (quoting *Strickland*, 466 U.S. at 687).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

## 3. Objective Reasonableness Under § 2254(d)

The denial of this claim was also reasonable. First, the gang enhancement was overturned for insufficient evidence by the California Court of Appeal. Thus, there is no further relief this court can provide on that issue. *See Gutierrez v. Beard*, No. 14-cv-03767-YGR, 2016 U.S. Dist. LEXIS 18644, *19 (N.D. Cal. Feb. 16, 2016) ("Petitioner contends that trial counsel was ineffective for failing to object to the false imprisonment count as a lesser-included offense of the kidnapping count. However, on direct appeal the California Court of Appeal overturned the conviction for false imprisonment because it was a lesser-included offense. Because the false imprisonment count has already been reversed, there is no other relief this Court can provide."). To the extent petitioner alleges that an objection to his gang enhancement would have resulted in a different outcome on either the attempted murder counts or gun enhancement, that claim is denied for the same reasons identified in ¶ A.

18

Second, petitioner cannot demonstrate that he was prejudiced by his trial counsel's failure to compel discovery of gunshot residue tests with respect to Pantoja or any other suspect. As described above, he has not demonstrated that the results of such tests would have been favorable to him. Thus, he cannot show that, had his trial counsel moved to compel such tests, there would have been a substantial likelihood of a different outcome. Additionally, it is unclear that such tests could have been produced even if trial counsel had moved to compel them. Petitioner alleges that law enforcement failed to "collect or preserve" residue tests on Pantoja. ECF No. 1 at 18. Accordingly, petitioner has not demonstrated that his trial counsel could actually have obtained any the residue tests even if she had moved to compel them.

## CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: July 3, 2018.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE